## KAPEA *et al. vs.* W. L. MOEHONUA.

### IN EQUITY. BEFORE HARTWELL, J.

### AUGUST, 1871.

A deed ordered to be cancelled on the ground of fraud of the grantee, it appearing that the grantor, an illiterate man, supposed the deed was a power of attorney; that relations of trust and confidence existed between the parties; and that the grantee derived an inordinate advantage from the transaction.

Prior decisions of this Court, as to rescinding conveyances, considered.

### DECISION OF HARTWELL, J.

Bill in equity alleging that Antone Haalou, under whom the complainants claim, was induced by false representations to sign a pretended power of attorney, which was in fact a deed of conveyance of his lands to the respondent, now claimed by his heirs. The nature of the answer is stated in the opinion of the Court.

### BY THE COURT.

It is seldom that the equity power of this Court has been invoked for the purpose of rescinding conveyances. In *Kapaakea vs. Morrison,* 2 Hawn., 272, the Chancellor decreed that a conveyance be set aside on petition of the vendor, on the ground of fraud, by reason of misrepresentations made by the vendee when occupying certain confidential relations with the vendor. This decree was affirmed by the Court in banco, in June, 1862.

In *Wood vs. Stark,* 1 Hawn., 9, the jury were instructed in an action of contract to recover rent due on a written lease, to find for the defendant if the lease was made and received in fraud of creditors. Like instructions were given in *Cockett vs. Hubbard, Ib.,* 101, on the invalidity of a deed of conveyance as against creditors. So in *Alo vs. Blair, Ib.,* 153. In *Williams vs. Kaea, Ib.,* 236, a deed of conveyance, absolute on its face, was held to have been intended as a mortgage, and a re-conveyance on payment of the debt was decreed. In *Turner's Case, Ib.,* 266, in probate, the Court held that an administrator must account to the intestate's heirs for the proceeds of a sale of the real estate ordered by the Court, purchased by a third party for the administrator and by him resold, on the ground that a trustee should derive no benefit from his trust.

In *Cleghorn vs. Austin,* 3 Hawn., 44, an action of contract was brought to recover the value of goods mortgaged to the plaintiff by the defendants' assignor in bankruptcy. The defence that the mortgage was in fraud of rights of creditors, and executed by an illiterate person without full knowledge of its effect, was

held by the Court in banco to be good. In *Ainini vs. Kala, ante,* page 16, a conveyance of land was decreed to be void on the ground of fraud, or under advantage taken of a position of trust to drive an unfair bargain with an aged woman, and a reconveyance was ordered. These cases are all that have come before the Court, so far as I can learn, which bear on the points in the present case.

The rules which apply in this case are very plain and clear. As between the grantee and the grantor and his heir, a conveyance executed under false representations, and by mistake of its meaning and effect, is always held to be void. In addition to the decisions above referred to, the remarks of the Court in two recent English Chancery cases will serve to define the rule which must be applied when, as in this case, special advantage is obtained by one occupying a position of trust. "The jurisdiction exercised by Courts of Chancery over the dealings of persons standing in certain fiduciary relations has always been regarded as one of the most salutary description. Whenever two persons stand in such a relation, that while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage." Per Chelmsford, Ld. Ch., in *Tate vs. Williamson,* 2 Ch., 61, 1866. "I take it to be a well-established principle of this Court, that persons standing in a confidential relation towards others can not entitle themselves to hold benefits which those others may have conferred upon them unless they can show to the satisfaction of the Court that the persons, by whom the benefits have been conferred, had competent and independent advice in conferring them." Per Turner, J., in *Rhodes vs. Bate,* 1 Ch., 257, 1866.

The rule, of course, applies also, that fraud is never presumed, but must be established by affirmative evidence, and that a deed *prima facie* valid can only be set aside by proof of

sufficient facts to authorize the intervention of a Court of Equity on established principles of equity.

I will recite the facts in the case which are proved by uncontradicted evidence, or are admitted, which appear to me to be in any degree material to the issue.

Antone Haalou, master of a coasting vessel trading between these islands, died intestate, in Honolulu, in April, 1869, leaving a widow, a sister, and a nephew, the complainants. He was an old friend of the respondent, and lived on terms of great intimacy with him. In 1860, August 10, the respondent executed and delivered to Antone his promissory note in the sum of $600, payable February 10, 1861, which note has never been cancelled or re-delivered, and is now in possession of Antone's heirs. September 27, 1860, respondent executed to Antone a conveyance of certain land in Kalihi, Apana 5, Land Award No. 6450, in which a consideration of $800 is stated in figures, the figure eight having evidently been originally a six, and changed to an eight. This conveyance is acknowledged, not recorded, and is now in the respondent's hands. Antone, by his first wife, had an interest in certain land in Manoa Valley, which, by deed of January 30, 1866, he conveyed to one Kamalula, the deed being duly acknowledged and recorded on the day of its date. It does not appear that he ever had any interest in any other land in Manoa, or elsewhere, except in a certain house lot and in a kalo lot at Honolulu. April 10, 1865, Antone executed a deed of conveyance to the respondent of the said house and kalo lots, and of the land in Kalihi described in the respondent's conveyance of September 27, 1860, in which the consideration of $800 is expressed. This deed is signed by Antone's mark, witnessed by Thomas Brown, and acknowledged and recorded on the day of its date, and is in the respondent's possession. The Royal Patent to Akoni, No. 3602, of said house lot, is in complainant's possession, and Royal Patent, No. 658, of said kalo lot, to one Maau, with his conveyance thereof to Antone, executed in December, 1849, acknowledged by one of its witnesses after Maau's death, April

29, 1869, and recorded April 30, 1869, is in the respondent's possession. May 16, 1867, and for several weeks following, the respondent published in the *Au Okoa* newspaper, in Honolulu, a notice that he had come to be in charge of all Antone's lands, to manage, sell or lease them at his option, and calling upon all men to come before him and not before Antone. June 15, 1868, Antone gave to one Ani a lease of a portion of his house lot for one year, with privilege of renewal for six years, by indentures signed by himself and Ani. The respondent was aware that this lease was applied for, and that it was executed, and did not inform the lessee that he claimed to own the lot. The respondent owns a fish pond at Kalihikai, of which Antone had the profits for three years, placing a native in charge who paid to him its proceeds, $200 a-year for three years, from 1860 to 1863. Antone, with his wife, wife's father and sister, lived on the house lot until his death, and some six or eight months before his death declined to sell the kalo lot on urgent request from Mr. Everett, who desired to buy, stating as a reason for not wishing to sell, that he required the land for the support of his family. He was repeatedly known to speak of the respondent as his agent, but was never heard to speak of having sold his land, except as appears in the evidence of Makalena, who drew the deed of April 10, 1865, and says he read and explained its contents to Antone, who had previously requested him to draw this deed; that he suggested that some consideration should be expressed, whereupon Antone said he owed respondent $800 for four years' rent of the fish pond, and that after the deed was drawn, read and explained, Antone approved it. After Antone's death, his widow and sister went to see the respondent, at his request, talked with him about their shares of the property, and were told to go back and live there as before until the widow married again, when her husband must take care of her. No acts of ownership on the land were performed by respondent during Antone's lifetime, except as appear in Komo's evidence that Antone told him respondent's consent was necessary before he could execute the said lease. The only

explanation of the said notice of respondent's agency of Antone's land is in the evidence of the woman who testified that she was sent by Antone, in 1867, to ask respondent to see him about his Manoa land, and that the newspaper notice was concerning that land. The day before the deed of April 10, 1865, Antone had a talk with the respondent, at the house of the latter, in the presence of Makalena, who drew the deed, on the subject of sudden deaths, and the propriety of making their property over to each other to avoid trouble after death. Makalena is not sure that Antone felt that the respondent could sell all his land the day after this deed was made, and need not wait until after his death; he also states that he heard after the date of this deed that respondent was Antone's agent. He says he thought Antone intended a gift of his land to the respondent.

The three lots conveyed by this deed were worth as follows, viz.: The Kalihi lot, purporting to be sold by respondent to Antone in 1860 for $800; the house lot worth $1,000 in 1860, and $1,500 now; the kalo lot, worth in 1865, $750. The year after Antone's death, both the complainants and the respondent paid the taxes on these lots. The respondent, in his answer, says that his newspaper notice of agency referred to Antone's Manoa land, and was in consequence of acts of trespass committed there, greatly to Antone's annoyance; but it is not shown that Antone had any interest in land at Manoa after his conveyance of January 30, 1866, or that he ever suffered from acts of trespass on his land. The respondent, in his answer, also says that before leasing his fish-pond to Antone, he had leased it to one Keliiopunui for $200 a-year; but this same Keliiopunui testifies that he never had the pond from the respondent, but was placed in its charge by Antone during the three years preceding the death of Kamehameha IV., in 1863. None of Antone's or the respondent's acquaintances ever heard either of them speak of the sale, except as already stated by Komo and Makalena. The registrar merely asks natives who acknowledge instruments, whether it is their signature, and if the paper is correct? There is no evidence that Antone ever

disagreed with his family or showed any ill-will towards them, or expressed any desire to confer a special benefit on the respondent.

On these facts, it seems clear enough to my mind that Antone never intended to convey the fee of his lands to the respondent, unless by a species of trust deed. It is not claimed that the conveyance was made from love and affection, but for a previous debt of $800, on account of Antone's use of respondent's fish-pond; a debt not shown to be over $600. Why should Antone, in 1865, merely to pay this debt, convey not only the Kalihi land, which respondent says he conveyed to Antone in 1860 for $800, but other land of at least $2,250 in value, being all the land he possessed, thereby disinheriting his heirs? It requires proof of clear reasons for such an utterly improbable and reckless course, to make it seem even probable or the act of a sane mind.

The $800 debt is not proved, and the $600 shown to have been received by Antone from the proceeds of the fish-pond were as likely to have been in payment of the note, as is the deed of September, 1860, executed before the note fell due, and never shown to be in Antone's hand, or to refer to land which he ever claimed to own. It seems a far more natural inference that this conveyance was not completed by delivery. If it were conveyed, why the need of re-delivery of the deed in 1865 on a re-conveyance, unless the latter transaction was a deed of trust?

The notice of agency is not explained. If trespasses were committed on Antone's land in Manoa in 1867, or if he owned any land there then, it might and ought to have been shown how. If the respondent were authorized to sell or lease Antone's land as he says he was, he knew very well, being a man of experience and intelligence, that some power of attorney was requisite to authorize him to execute leases and deeds for Antone. He shows none, however, except in the document dated April 10, 1865.

The fish-pond is not shown previously to have been leased to Keliiopunui as the answer claims, and only a three years' payment of its proceeds to Antone is shown.

No explanation is better than one which is contradicted by the respondent's own witnesses, and not sustained in points susceptible of present proof. The evident alteration of figures in one of the deeds causes suspicion.

I do not think the deed of 1865 expresses the real agreement between the parties. Every fact in the case points to the conclusion that this instrument was intended and believed by Antone to be a conveyance in trust, to respondent, to secure him against real or imagined trouble, and to empower the latter to act for him. The recording of the deed is all that conflicts with this view, and that, in connection with all the facts shown, is consistent with equitable ownership remaining in Antone.

The respondent's silence about the sale, his own and Antone's assertion of an agency only, Antone's occupancy, claims and acts of ownership, the relations of trust and confidence existing between the respondent and this illiterate sailor, and the inordinate advantage derived by the respondent from the transaction, the utter failure to explain the agency notice; these are facts too significant to be winked out of sight or explained away.

I therefore decree that the respondent do deliver up, for cancelling, the deed of April 10, 1865, and that he execute a valid deed of conveyance, to the complainants, of the house lot and kalo lot in Honolulu. In regard to the Kalihi lot, there is not proof that it was actually sold and delivered. Its legal title is not disturbed, and no order concerning it is made.

*A. F. Judd* for complainants.
*R. H. Stanley* for respondents.
Honolulu, August 25, 1871.