B & A ASSOCIATES, Plaintiff,

v.

L.A. YOUNG SONS CONSTRUCTION COMPANY, and Reliance Insurance Company, Defendants.

RELIANCE INSURANCE COMPANY, Third–Party Plaintiff and Appellee,

v.

UTAH DEPARTMENT OF TRANSPORTATION, Third–Party Defendant and Appellant.

No. 880239.

Supreme Court of Utah.

July 23, 1990.

R. Paul Van Dam, Donald S. Coleman, and Leland D. Ford, Salt Lake City, for Utah Dept. of Transp.

Robert F. Babcock and Michael C. Van, Salt Lake City, for B & A Associates.

Paul R. Howell, Clark B. Fetzer, and Mark R. Madsen, Salt Lake City, and David Hughes, Mission Viejo, Cal., for L.A. Young Sons Const. Co. and Reliance Ins. Co.

HALL, Chief Justice:

This case involves only Reliance Insurance Company (Reliance) as appellee and Utah Department of Transportation (UDOT) as appellant and is on appeal from a grant of a partial summary judgment in favor of Reliance in the Third Judicial District Court, Salt Lake County. The trial court held that no genuine issues of material fact existed with respect to a supplemental agreement between Reliance's assignor, L.A. Young Sons Construction Company (Young), and UDOT compensating Young for fixed costs and overhead incurred by a 63.9 percent underrun on a UDOT project.

## FACTS

On April 23, 1985, UDOT began accepting bids on a project to reconstruct a por-tion of Interstate 80 near Black Rock in Tooele County, Utah (the project). On May 13, 1985, Young was awarded the bid and contracted with UDOT to perform all construction work on the project for the approximate sum of $9,940,893.25.

Reliance furnished both payment and performance bonds for Young on the project. In addition, Young entered into continuing agreements of indemnity with Reliance pursuant to which Reliance is assigned any claims or causes of action Young may have in connection with the project.

Included in Young's bid was a cost estimate for the placement of 226,200 tons of "riprap." Young initially subcontracted the riprap work to B & A, which bid $5 per ton to Young. Young in turn bid only $4 per ton on its master bid schedule. The bid was based on a quantity estimate supplied by UDOT engineers and relied upon by all contractors who submitted bids.

Also included in Young's bid was a cost estimate for "clearing and grubbing" that was well in excess of UDOT's estimate. While UDOT estimated $5,000 for clearing and grubbing and the average bid submitted by contractors was $38,052, Young's bid was $832,420. This inflated bid was attributed to "unbalanced bidding," a practice whereby contractors attempt to mask or hide their cost structure from competitors by overbidding some aspects of the project and underbidding others. Unbalanced bidding is also utilized to attempt to meet increased funding needs at particular intervals in the project.

Young was awarded the bid under condition that Young accept payment for the clearing and grubbing in stages. After Young accepted this condition, UDOT sought approval to award the unbalanced contract from the Federal Highway Administration (FHWA), which administered the federal highway funds used in the project. FHWA raised some concerns about the quantity of riprap specified by the UDOT engineers, but after receiving verification from UDOT's district director, FHWA concurred in the bid award to Young as proposed by UDOT.

As the project continued, it became obvious that the quantity of riprap was grossly overestimated and that instead of the initial 226,200 tons, only 81,724.8 tons were necessary to complete the project. The actual amount of 81,724.8 represents a 63.9 percent underrun.

Section 104.02 of UDOT's standard specifications provides for an adjustment in compensation to the contractor when there is an underrun in excess of 25 percent. The purpose of this section is to compensate contractors for overhead and other fixed costs associated with an underrun. Pursuant to section 104.02, Young submitted a claim for the riprap work.

On August 29, 1986, UDOT's project engineer, John Nye, determined that Young was entitled to a supplemental agreement to compensate for the underrun of riprap. "Supplemental Agreement #11" (S.A. #11) was prepared and submitted for approval to compensate Young in the amount of $274,104.98 based upon payroll, equipment, and actual costs associated with the riprap item. S.A. #11 was signed by all necessary state parties to the agreement but was not delivered to Young.

Supplemental agreements on federal aid projects require concurrence by FHWA as a precondition to securing federal aid funding. When S.A. #11 was submitted for concurrence, FHWA notified Bert Taylor, UDOT's chief construction officer, that it would not participate in the cost of S.A. #11 because of the previous concerns it had expressed regarding the riprap quantity and UDOT's apparent negligence in estimation.

Following FHWA's refusal to participate in S.A. #11, Taylor realized the possible connection between the inflated bid for "clearing and grubbing" and the underrun in the riprap. Taylor notified John Nye that S.A. #11 would not be implemented; hence, it was never delivered to Young.

John Nye subsequently drafted S.A. #14, which was essentially the same as

S.A. #11, except that it credited $226,200 against the amount due under S.A. #11. The $226,200 figure was reached because the original quantity estimate for riprap was 226,200 tons and Young underbid its subcontractor's bid by $1 per ton. UDOT perceived that at least part of the unbalancing of the clearing and grubbing bid item accounted for the fact that Young was able to bid $4 per ton on the riprap even though its subcontractor, B & A, had submitted a bid for $5 per ton. The result of S.A. #14 was to supplement Young in the amount of $47,907.08, instead of $274,104.98 under S.A. #11. S.A. #14 was never implemented because Taylor believed Young had already been overpaid.

Young brought an action against UDOT to recover the amount it asserted was due under the UDOT specifications for underruns and to enforce S.A. #11. UDOT claimed that it was justified in its offset of the underrun because of the perceived overpayment for clearing and grubbing and argued for equitable relief because of the unbalanced bid. In addition, UDOT asserted the defense of unilateral mistake in that when Mr. Taylor realized his mistake in signing S.A. #11 before he recognized the connection in the unbalanced bidding, he immediately rescinded S.A. #11. The trial court granted summary judgment to Reliance, which is the assignee of Young, and ordered that S.A. #11 be enforced.

Summary judgment is granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[1] Where there is a material issue of fact, however, summary judgment is inappropriate.[2]

### I. VALIDITY OF S.A. #11

UDOT first claims that an issue of fact exists with regard to whether S.A. #11 is a valid and binding contract. It is undisputed that all of the necessary UDOT signatures were affixed to S.A. #11 and that the document itself was never physi-

1. *Utah State Coalition of Senior Citizens v. Utah Power and Light Co.,* 776 P.2d 632, 634 (Utah 1989); Utah R.Civ.P. 56(c).

2. *Forsman v. Forsman,* 779 P.2d 218, 220 (Utah 1989).

cally delivered to Young. It is also undisputed that S.A. # 11 states: "Signing this agreement settles any and all claims on Contract Item No. 9, Mechanically Placed Rip Rap."

In *Aspen Acres Association v. Seven Associates, Inc.,*[3] a contract for transfer of water rights and a water system was in dispute. In reversing the trial court's determination that the contract was binding, we held:

> [T]he mere affixing of the signatures to the document did not conclusively prove that there was a binding contract. In addition, there must be a delivery, not in the traditional sense of a manual transfer, but in the sense that it was the intent of the parties to have the document become legally operative at some definite point in time, however such intent might be indicated.[4]

Despite the fact that S.A. # 11 was never physically delivered to Young, UDOT plainly evidenced its intent by affixing all of the necessary signatures, which the document itself states is an act indicating an intent to be bound. UDOT drafted S.A. # 11 and must be bound by the unambiguous terms and conditions within the four corners of the document.[5] We therefore affirm the trial court's determination that S.A. # 11 was a valid and binding contract.

## II. RESCISSION OF S.A. # 11

■ UDOT's next claim is that assuming S.A. # 11 is a valid and binding document, UDOT's chief construction officer, Bert Taylor, signed it under a unilateral mistake of fact and was justified in rescinding the contract. UDOT claims that subsequent to signing S.A. # 11, Taylor realized that in addition to the amount possibly due under S.A. # 11, Young had already been paid $226,200 for the riprap but it was disguised as "clearing and grubbing" because of Young's unbalanced bid.

The record is unclear as to the exact accounting made, and the briefs are not helpful in that regard. However, it would appear that because of Young's increased overhead and other expenses incurred as a result of the underrun, UDOT utilized S.A. # 11 to recalculate the amount due under the riprap item as follows:

Amount Under S.A. # 11

$$81724.8 \times 7.354 = \$601,004.18$$
(quantity supplied) (adj. unit price)

Amount Already Paid to Young Under Original Contract

$$81724.8 \times 4.00 = \$326,899.20$$
(quantity supplied) (unit price)

Because Young had apparently already been paid $326,899.20, that amount was subtracted from $601,004.18 to arrive at the $274,104.98 figure that Young is claiming for the unpaid balance under S.A. # 11. At the very least, UDOT is claiming that $226,200 should be subtracted from the $274,104.98 because $226,200 had already been paid on the riprap item to Young by virtue of its unbalanced item of "clearing and grubbing."

In *John Call Engineering v. Manti City Corp.,*[6] we delineated the elements of unilateral mistake as follows:

1. The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable.

2. The matter as to which the mistake was made must relate to a material feature of the contract.

3. Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake.

4. It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in status quo.[7]

**3.** 29 Utah 2d 303, 508 P.2d 1179 (1973).

**4.** *Id.* at 310–11, 508 P.2d at 1184 (citing *Yee v. Okamoto,* 45 Haw. 445, 370 P.2d 463 (1962)).

**5.** *See, e.g., Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987).

**6.** 743 P.2d 1205 (Utah 1987).

**7.** *Id.* at 1209–10; *see also Briggs v. Liddell,* 699 P.2d 770, 773 (Utah 1985); *Ashworth v. Charlesworth,* 119 Utah 650, 656, 231 P.2d 724, 727 (1951).

We have also held, "When one party's mistake of fact is coupled with knowledge of the mistake by the other party or a mistake is produced by fraud or other inequitable conduct by the nonerring party, the mistake provides a basis for reformation or rescission."[8] Indeed, reformation or rescission may be available "where, unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of the mistake at the time of the execution of the instrument and later seeks to take advantage of it...."[9]

It thus appears that genuine issues of fact exist with regard to whether Bert Taylor signed and approved S.A. #11 under a mistake of fact, specifically, whether Taylor realized at the time he signed S.A. #11 that the item of riprap covered in S.A. #11 was related to the unbalanced item of clearing and grubbing. In other words, did Taylor realize that Young had already been paid $226,200 of the riprap work because that amount had been lumped into the unbalanced "clearing and grubbing" bid? If UDOT is able to make a showing of unilateral mistake, then rescission of S.A. #11 is the proper remedy.[10]

It is to be observed that UDOT is not attempting to offset the "riprap underrun" against the "clearing and grubbing"; rather, UDOT is attempting to rescind S.A. #11 and counterclaim against Young in order to recover the payment of $226,200 to Young for riprap that was disguised as part of the unbalanced "clearing and grubbing." Even had UDOT suspected that part of the riprap item was being "subsidized" through the "clearing and grubbing" item, UDOT had no reason to object to the unbalancing until the underrun became apparent and a supplemental agreement was used to further compensate Young.

## III. UDOT'S COUNTERCLAIM

Inasmuch as sufficient facts involved in the bidding process and the unbalancing of Young's bid have not as yet been developed, UDOT should be allowed to file its counterclaim in order to raise the factual issues related to the unbalanced bidding, Young's motive behind the unbalancing, Young's knowledge that it had already been paid $226,200 of the riprap work through the unbalanced "clearing and grubbing" payment at the time it submitted its claim for a supplemental agreement, and any agreements between Young, B & A, and Reliance that affect the liability of UDOT.

Reversed in part and remanded for further proceedings consistent with this opinion.

STEWART, DURHAM and ZIMMERMAN, JJ., and NORMAN H. JACKSON, Court of Appeals Judge, concur.

HOWE, Associate C.J., does not participate herein; JACKSON, Court of Appeals Judge, sat.

8. *Guardian State Bank v. Stangl,* 778 P.2d 1, 5 (Utah 1989) (citing *Thompson v. Smith,* 620 P.2d 520, 523–24 (Utah 1980); *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter–Day Saints,* 565 P.2d 63 (Utah 1977)).

9. *Spirt v. Albert,* 109 Conn. 292, 300, 146 A. 717, 720 (1929), *quoted in Guardian State Bank,* 778 P.2d at 6.

10. *See John Call Eng'g,* 743 P.2d at 1209; *Southern Title Guar. Co. v. Bethers,* 761 P.2d 951, 956 n. 2 (Utah Ct.App.1988); Restatement (Second) of Contracts § 153 (1981).